<u>**PUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-2278**

_____

J. NEIL DEMASTERS,

        Plaintiff – Appellant,

    v.

CARILION CLINIC; CARILION MEDICAL CENTER; CARILION
BEHAVIORAL HEALTH, INC.,

        Defendants – Appellees.

-------------------------

NATIONAL EMPLOYMENT LAWYERS ASSOCIATION; EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

        Amici Supporting Appellant.

_____

Appeal from the United States District Court for the Western
District of Virginia, at Roanoke. Michael F. Urbanski, District
Judge. (7:12-cv-00580-MFU-RSB)

_____

Argued: January 29, 2015        Decided: August 10, 2015

_____

Before Thomas L. AMBRO and Cheryl Ann KRAUSE, Circuit Judges of
the United States Court of Appeals for the Third Circuit,
sitting by designation, and Maryanne Trump BARRY, Senior Circuit
Judge of the United States Court of Appeals for the Third
Circuit, sitting by designation.[*]

_____

    [*] As all members of the Court of Appeals for the Fourth
Circuit are recused in this case, a panel from the neighboring
Third Circuit was appointed for this appeal.

---

Reversed and remanded by published opinion.  Judge Krause wrote the opinion, in which Judge Ambro and Senior Judge Barry joined.

---

**ARGUED:** Terry Neill Grimes, TERRY N. GRIMES, ESQ., PC, Roanoke, Virginia, for Appellant.  Frank Kenneth Friedman, WOODS ROGERS PLC, Roanoke, Virginia, for Appellees.  Susan L.P. Starr, U. S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus United States Equal Employment Opportunity Commission.
**ON BRIEF:** Brittany Michelle Haddox, TERRY N. GRIMES, ESQ., PC, Roanoke, Virginia, for Appellant.  Agnis Chandra Chakravorty, Joshua Richard Treece, WOODS ROGERS PLC, Roanoke, Virginia, for Appellees.  Michael L. Foreman, PENNSYLVANIA STATE UNIVERSITY DICKINSON SCHOOL OF LAW CIVIL RIGHTS APPELLATE CLINIC, State College, Pennsylvania; Roberta L. Steele, NATIONAL EMPLOYMENT LAWYERS ASSOCIATION, San Francisco, California, for Amicus National Employment Lawyers Association.  P. David Lopez, General Counsel, Lorraine C. Davis, Acting Associate General Counsel, Carolyn L. Wheeler, Assistant General Counsel, U. S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus United States Equal Employment Opportunity Commission.

---

2

KRAUSE, Circuit Judge:

In 2011, after five years of employment as an employee assistance program consultant in Carilion's behavioral health unit, Appellant J. Neil DeMasters allegedly was fired for acting "contrary to his employer's best interests," failing to take the "pro-employer side," and leaving his employer "in a compromised position," as a result of his support of a fellow employee's sexual harassment complaint and his criticism of the way the employer had handled the investigation. DeMasters brought suit against Carilion Clinic, Carilion Medical Center, and Carilion Behavioral Health, Inc. (collectively, "Carilion"), claiming that he was terminated for engaging in protected activity, including opposing an unlawful employment practice, in violation of Title VII of the Civil Rights Act of 1964. The District Court dismissed DeMasters' complaint, primarily on the grounds that no individual activity in which DeMasters engaged by itself constituted protected oppositional conduct and that the so-called "manager rule," in any event, prevented an employee whose job responsibilities included reporting discrimination claims from seeking protection under Title VII's anti-retaliation provision. As we now hold that the proper test for analyzing oppositional conduct requires consideration of the employee's course of conduct as a whole and that the "manager rule" has no

3

place in Title VII jurisprudence, we will reverse and remand for DeMasters to proceed with his suit.

## I.

### A.

DeMasters began working in July 2006 as an employee assistance program ("EAP") consultant for Carilion, a large healthcare organization that owns and operates several hospitals.[1]  In October 2008, DeMasters was consulted by John Doe, a Carilion employee who had been referred to the EAP for help.  At this meeting, Doe revealed that his department manager had been harassing him for the last several months and described how his manager had masturbated in front of him twice on hospital grounds, asked Doe for oral sex, and asked Doe to display his genitals.  Doe also offered that he had physical evidence of the harassment.

After hearing Doe out, DeMasters opined that Doe was a victim of sexual harassment in violation of Carilion's sexual

---

[1] Because we are reviewing this case on a motion to dismiss, we adopt the facts as alleged in DeMasters' first amended complaint.  The complaint here does not provide specific details concerning the scope of DeMasters' counseling responsibilities.  As a general matter, however, "[e]mployee [a]ssistance [p]rograms are worksite-based programs designed to assist employees in identifying and resolving personal issues, ranging from health, marital, and financial concerns to substance abuse and emotional problems."  Oleszko v. State Comp. Ins. Fund, 243 F.3d 1154, 1155 (9th Cir. 2001).

harassment policy and formulated a plan with Doe to report the harassment and facilitate the investigation of Doe's complaint. To assist Doe with this reporting and investigation, DeMasters suggested that Doe sign a release form that authorized DeMasters to communicate with Carilion's human resources ("HR") department directly on Doe's behalf. That same day, DeMasters put this plan in motion by contacting the HR department, relaying the substance of Doe's complaint, and thereby initiating the investigation of Doe's alleged sexual harassment. Once Carilion began to investigate the matter and took a statement from Doe, it fired the harasser and told Doe that this individual would never be allowed back on hospital property.

A few days later, however, DeMasters received a distressed call from Doe, who had learned that the harasser had been permitted by Doe's department director to come back to the hospital to collect his belongings. DeMasters then scheduled another meeting with Doe for the following day. At that meeting, Doe explained that he felt uncomfortable with the department director and was facing increasing hostility from co-workers aligned with the harasser. To ascertain how best he could assist Doe with this increasingly hostile workplace, DeMasters convened a meeting of his EAP colleagues, who agreed that DeMasters should contact Carilion's HR department to offer suggestions as to how it might better handle the situation,

including by intervening to stop the hostile behavior by the harasser's friends. DeMasters followed through on this plan by calling and leaving a message for an HR representative who called him back the next day.

In that conversation, after confirming that the HR representative was aware that Doe was being subjected to harassing behavior from his co-workers, DeMasters offered to coach Carilion's HR department about better ways to respond to Doe's concerns. The HR representative declined and stated that he would speak with the department director. However, several days later, Doe reported to DeMasters that his co-workers' behavior was getting worse, that he was dissatisfied with management's reaction to his complaint, and that he feared his harasser would come looking for him with a gun. In response, DeMasters offered his opinion that Carilion's management and HR department had been mishandling Doe's complaints. DeMasters also reached out to Carilion's HR manager again to say that he felt that Carilion was not handling the case properly.

DeMasters does not allege any subsequent contact with Doe or activity on Doe's behalf and apparently was unaware of the legal remedies pursued by Doe over the next two years. In 2010, however, one of Carilion's managers called DeMasters and informed him that Doe had filed a Title VII complaint with the Equal Employment Opportunity Commission ("EEOC") and was

pursuing a civil suit for sexual harassment against Carilion. In that conversation, the manager pressed DeMasters on his involvement with Doe's harassment complaint. DeMasters acknowledged that Doe had been to the EAP but did not reveal any details of DeMasters' own involvement with Doe's internal complaints. The manager told DeMasters that he might expect to hear more from Carilion on the matter.

That he did. Within a few weeks of Doe and Carilion reaching a settlement, DeMasters was called to a meeting with several of Carilion's managers, including the vice president of HR, the EAP department director, and corporate counsel. When DeMasters asked at the outset if he could have counsel present, he was told that if he persisted he would be considered insubordinate and would be terminated. The Carilion managers then proceeded to ask DeMasters about Doe's sexual harassment complaint and specifically whether DeMasters told Doe that what happened to him was sexual harassment. When DeMasters acknowledged sharing his view that Doe was a victim of sexual harassment, the managers asked DeMasters why he had not taken "the pro-employer side" and if he understood the magnitude of the liability the company could face if one of its supervisors had engaged in harassment. J.A. 31-32. The managers also told DeMasters that he had not protected Carilion's interests and that he had left Carilion "in a compromised position." J.A. 32.

7

The EAP department director likewise accused DeMasters of "fail[ing] to protect Carilion" and "plac[ing] the entire operation at risk." Id.

Two days after this meeting, Carilion fired DeMasters. Carilion's letter to DeMasters, explaining the reasons for his termination, stated that DeMasters had "fail[ed] to perform or act in a manner that is consistent with the best interests of Carilion Clinic." Id. Separately, the EAP department director sent DeMasters a letter stating that he was being fired because he: (1) "made statements that could reasonably have led [Doe] to conclude that he should file suit against Carilion"; (2) "failed to perform or act in a manner that is consistent with the best interests of Carilion Clinic"; (3) "made multiple statements that were contrary to his employer's best interests and that required disciplinary action"; and (4) "failed to protect Carilion EAP's client company, in this case also the employing organization, Carilion." Id. This letter concluded that "the EAP contractor was very fortunate to be able to maintain this company as the entire operation was at risk for the actions of one consultant." Id. By way of further explanation, DeMasters' direct supervisor in the EAP told him that Carilion was angry at having to settle Doe's discrimination lawsuit and was looking to "throw somebody under the bus." Id.

8

**B.**

After filing a charge of discrimination with the EEOC and receiving a notice of right to sue, DeMasters timely filed a complaint in the District Court for the Western District of Virginia.  In that complaint, DeMasters claimed that Carilion terminated his employment in violation of Title VII's anti-retaliation provision, under various legal theories, including that he was fired in violation of Title VII's so-called Opposition Clause, which forbids retaliation against an employee who "oppose[s] any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).[2]

The District Court granted Carilion's motion to dismiss, concluding that DeMasters failed to raise plausible allegations that he engaged in protected activity under the Opposition Clause because: (1) the conversations that took place between DeMasters and Doe about the alleged discrimination did not

---

[2] In a thorough and thoughtful analysis, the District Court also rejected DeMasters' arguments that he was fired in violation of Title VII's Participation Clause, which protects employees who "ma[ke] a charge, testif[y], assist[], or participate[] in any manner in an investigation, proceeding, or hearing under this subchapter," 42 U.S.C. § 2000e-3(a), and that he was fired as a matter of unlawful third-party retaliation to punish Doe, see Thompson v. N. Am. Stainless, LP, 562 U.S. 170 (2011).  We have no need to reach DeMasters' Participation Clause or third-party retaliation arguments because we hold that DeMasters stated a claim for retaliation under the Opposition Clause and will reverse on that basis.

9

constitute purposive communications from DeMasters to Doe's employer, Carilion; (2) DeMasters' communications to Carilion merely reflected transmissions of Doe's complaints and not DeMasters' own opposition to unlawful activity; and (3) DeMasters' criticisms of the way Carilion handled the investigation did not oppose activity that itself was unlawful under Title VII. In addition, the District Court held that, under the so-called "manager rule," even if the activity were otherwise protected, DeMasters could not avail himself of that protection because he was acting within the scope of his job duties as an EAP consultant in counseling Doe and communicating with Carilion. The District Court therefore dismissed DeMasters' complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). This timely appeal followed.

## II.

The District Court had jurisdiction pursuant to 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1331, and we have appellate jurisdiction under 28 U.S.C. § 1291. We review the District Court's dismissal de novo, accepting all well-pleaded allegations of the complaint as true and drawing all reasonable inferences therefrom in favor of the plaintiff. Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). Like the District Court, we consider whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).[3]

## III.

Title VII forbids employment discrimination based on "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a), and its anti-retaliation provision serves to "prevent[] an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63 (2006); 42 U.S.C. § 2000e-3(a). In order to establish a prima facie Title VII retaliation claim, a plaintiff must demonstrate three elements: "(1) that [he] engaged in a protected activity, as well as (2) that [his] employer took an adverse employment action against [him], and (3) that there was a causal link between the two events." Boyer-Liberto v.

---

[3] The Fourth Circuit has previously held that a court must be "especially solicitous of the wrongs alleged" in a civil rights complaint, see, e.g., Slade v. Hampton Rds. Reg'l Jail, 407 F.3d 243, 248 (4th Cir. 2005); Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002), but more recently has called into question whether this special solicitude survives the heightened pleading standard articulated by Twombly and Iqbal, see Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009). This issue was not briefed by the parties, and we need not resolve it here because we conclude we would reverse and remand even under Twombly and Iqbal's higher standard.

11

Fontainebleau Corp., 786 F.3d 264, 281 (4th Cir. 2015) (en banc) (internal quotation marks omitted).

While it is undisputed that the second element is satisfied, the District Court in effect held that DeMasters did not plead either the first or third elements because he did not engage in protected activity under Title VII's Opposition Clause and thus was not terminated on that basis. We conclude that the District Court erred, first, by examining DeMasters' communications as if they were each discrete incidents rather than as a continuous course of oppositional conduct and, second, by applying the "manager rule" to DeMasters' Title VII retaliation claim. We address these issues in turn.

### A.

The District Court examined each of DeMasters' communications in a discrete fashion, analyzing separately DeMasters' conversations with Doe, DeMasters' communication of Doe's complaints to Carilion, and DeMasters' criticism to Carilion of its internal investigation, and concluded that no act by itself constituted protected activity. Neither the text nor the purpose of Title VII is served by this method of parsing a continuous course of oppositional conduct into individual acts and assessing those acts in isolation.

Title VII's Opposition Clause, by its terms, prohibits retaliation against an employee who has "opposed any practice

12

made an unlawful employment practice" by Title VII.  42 U.S.C. § 2000e-3(a).  The Supreme Court has defined "oppose" in this context by looking to its ordinary meaning: "to resist or antagonize . . . ; to contend against; to confront; resist; withstand, . . . to be hostile or adverse to, as in opinion." Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn., 555 U.S. 271, 276 (2009) (internal citations omitted) (quoting Webster's New International Dictionary 1710 (2d ed. 1958); Random House Dictionary of the English Language 1359 (2d ed. 1987)).  This broad definition led the Court to conclude that the threshold for oppositional conduct is not onerous.  Instead, "[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity."  Crawford, 555 U.S. at 276 (internal quotation marks omitted) (citing 2 EEOC Compliance Manual §§ 8–II–B(1), (2), p. 614:0003 (Mar. 2003)).

This Circuit, as well as the other Courts of Appeals, also has articulated an expansive view of what constitutes oppositional conduct, recognizing that it "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities."  Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998); see

13

also Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 47-48 (1st Cir. 2010) (recognizing that even non-verbal conduct may constitute protected activity); Barrett v. Whirlpool Corp., 556 F.3d 502, 516 (6th Cir. 2009) (protected activity includes "complain[ing] about unlawful practices to a manager, the union, or other employees"); Moore v. City of Philadelphia, 461 F.3d 331, 343 (3d Cir. 2006) (quoting Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006)) (protected activity covers "informal protests of discriminatory employment practices[,] including making complaints to management"); McDonnell v. Cisneros, 84 F.3d 256, 262 (7th Cir. 1996) (protected activity includes endeavoring to obtain an employer's compliance with Title VII).

And while the oppositional activity must be directed to "an unlawful employment practice" under Title VII, 42 U.S.C. § 2000e-3(a), this Circuit's recent en banc opinion in Boyer-Liberto made clear that we should also interpret "unlawful employment practice" broadly.   786 F.3d at 282.   Thus, "an employee is protected when she opposes 'not only . . . employment actions actually unlawful under Title VII but also employment actions [she] reasonably believes to be unlawful,'" and the Title VII violation to which the oppositional communication is directed "may be complete, or it may be in

14

progress." Id. (alterations in original) (quoting EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir. 2005)).

In sum, nothing in the language of the Opposition Clause nor in its interpretation by the courts supports a myopic analysis under which an employee's opposition must be evaluated as a series of discrete acts. 42 U.S.C. § 2000e-3(a). On the contrary, as the Third Circuit has observed in a similar context, "[t]hese determinations depend on the totality of the circumstances, as [a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." Moore, 461 F.3d at 346 (second alteration in original) (citations and internal quotation marks omitted). Likewise, in Collazo, where the plaintiff had arranged meetings with the HR department for a co-worker and then complained to HR about problems with his company's ongoing internal investigation of the co-worker's complaint, the First Circuit, reviewing the full range of the plaintiff's conduct, held that his "persistent efforts to help [the victim] initiate her sexual harassment complaint and urge Human Resources to act upon that complaint" constituted protected opposition activity. Id. at 43-44, 47.

This holistic approach is also consistent with the broad remedial purpose of Title VII: to root out the "cancer [of

15

discrimination] in [the] workplace." Boyer-Liberto, 786 F.3d at 284 (quoting Jordan v. Alt. Res. Corp., 458 F.3d 332, 356 (4th Cir. 2006) (King, J., dissenting)). This is particularly so in the retaliation context, where Title VII "must be read 'to provide broader protection for victims of retaliation than for [even] victims of race-based, ethnic-based, religion-based, or gender-based discrimination,' because 'effective enforcement could . . . only be expected if employees felt free to approach officials with their grievances.'" Id. at 283 (alterations in original) (quoting Burlington N., 548 U.S. at 66-67); see also Thompson, 562 U.S. at 174 ("Title VII's antiretaliation provision prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'") (quoting Burlington N., 548 U.S. at 68). Acknowledging and protecting activities that, viewed as a whole, oppose unlawful discrimination will promote the prompt and full reporting on which Title VII enforcement depends.

We conclude from this review of the statute and case law that we must examine the course of a plaintiff's conduct through a panoramic lens, viewing the individual scenes in their broader context and judging the picture as a whole. Although individual acts may be scrutinized to ascertain their nature, purpose, and nexus to the alleged objective, the touchstone is whether the plaintiff's course of conduct *as a whole* (1) "communicates to

her employer a belief that the employer has engaged in . . . a form of employment discrimination," Crawford, 555 U.S. at 276; and (2) concerns subject matter that is "actually unlawful under Title VII" or that the employee "reasonably believes to be unlawful," Boyer-Liberto, 786 F.3d at 282.

Applying these criteria to the allegations here, we are satisfied that DeMasters has alleged that he engaged in protected oppositional activity. First, the complaint describes a course of conduct by DeMasters that clearly and effectively conveyed to Carilion over several weeks his belief that Carilion was violating Title VII by subjecting Doe to unlawful conduct. See Crawford, 555 U.S. at 276. As alleged, DeMasters became Doe's leading advocate and adviser from the day Doe first told DeMasters about his manager's harassing behavior, and DeMasters persisted in his advocacy on Doe's behalf as Carilion investigated the complaint. DeMasters generated a plan with Doe to report the harassment and to galvanize Carilion's internal investigation, arranged for Doe to sign a release so that he could speak directly with HR on Doe's behalf, and relayed Doe's harassment complaint to HR, leading to the termination of the harasser. Upon learning that Doe was facing increasing hostility from co-workers who sympathized with the harasser, DeMasters consulted with his EAP colleagues and formulated another plan to try to draw Carilion's attention to the hostile

17

workplace and to improve the situation.  He then reached out to the HR department, ensured that an HR representative aware of the hostility confronting Doe, and offered EAP's services to coach the HR department on how to respond more effectively.  And when Doe reported that the hostile environment was only intensifying, DeMasters shared his opinion that Carilion was mishandling the matter not only with Doe but also with Carilion's HR manager.

The District Court concluded these allegations did not reflect protected activity because DeMasters, by "not complain[ing] himself of workplace discrimination or other unlawful employment practices" and "[m]erely ferrying Doe's allegations to Carilion's human relations department," did not engage in "purposive conduct."  J.A. 93, 96.  In imposing this requirement, the District Court relied on this Circuit's unpublished opinion in Pitrolo, where the panel held, consistent with Justice Alito's concurrence in Crawford, that "opposition" should be limited to "purposive conduct."[4]  Pitrolo v. Cty. of

_____

[4] This Circuit "ordinarily do[es] not accord precedential value to [its] unpublished decisions," although those decisions are entitled "to the weight they generate by the persuasiveness of their reasoning."  Pressley v. Tupperware Long Term Disability Plan, 553 F.3d 334, 339 (4th Cir. 2009) (quoting Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006)); see also 4th Cir. Loc. R. 32.1.  At least one other district court within this Circuit has also relied on Pitrolo to hold that opposition must be purposive.  See, e.g., Harris-
(Continued)

Buncombe, N.C., No. 07-2145, 2009 WL 1010634, at *3 n.6 (4th Cir. Mar. 11, 2009) (unpublished) (quoting Crawford, 555 U.S. at 281-82 (Alito, J., concurring)). While the Crawford majority defined "oppose" to include "to be hostile or adverse to, as in opinion," Crawford, 555 U.S. at 276, Justice Alito described this part of the definition as dictum, observed that the term's other meanings reflected "purposive conduct," and expressed concern that extending the definition to "silent opposition" (for example, "by employees who never expressed a word of opposition to their employers") would be excessive and impractical, id. at 282 (Alito, J., concurring).

We need not decide today on the vitality of a "purposive[ness]" requirement,[5] however, because, with the term

---

Rogers v. Ferguson Enters., No. 09-78, 2011 WL 4460574, at *7 (E.D.N.C. Sept. 26, 2011).

[5] We note the Crawford majority did not adopt such a requirement and was explicit that "'[o]ppose' goes beyond 'active, consistent' behavior in ordinary discourse, where we would naturally use the word to speak of someone who has taken no action at all to advance a position beyond disclosing it. . . . [W]e would call it 'opposition' if an employee took a stand against an employer's discriminatory practices not by 'instigating' action, but by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons." 555 U.S. at 277. And while the Sixth Circuit endorsed the "purposive conduct" test in Thompson v. North American Stainless, LP, 567 F.3d 804 (6th Cir. 2009) (en banc), the Supreme Court, in overruling on other grounds, emphasized the importance of using an objective standard in the Title VII anti-retaliation context "so as to 'avoi[d] the (Continued)

19

"purposive" properly construed, DeMasters' conduct would easily qualify in any event.  The District Court took "purposive" to mean that the protections of the Opposition Clause are limited to "an employee who directly communicate[s] to her employer her [own] experiences with [discrimination] in the workplace," and that the complaining employee must not only "intend[]…to relay [a co-worker's] complaints" to his employer, but also must "voice his own opposition to any unlawful employment practice." J.A. 94, 96.  It was mistaken.  Although Justice Alito sought to distinguish "silent opposition" and to limit the protection of the Opposition Clause to conduct that was "active and purposive," he was in full agreement with the majority that oppositional conduct need not be "instigated or initiated by the employee," and that an employee's communication to his employer about a belief that the employer has engaged in discrimination

_____

uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings.'"  Thompson, 562 U.S. at 175 (alteration in original) (quoting Burlington, 548 U.S. at 68-69)).  No other Court of Appeals has adopted Justice Alito's "purposiveness" requirement in a precedential opinion, cf. Thompson v. Somervell Cty., Tex., 431 F. App'x 338, 341 (5th Cir. 2011) (unpublished); Demers v. Adams Homes of Nw. Fla., Inc., 321 F. App'x 847, 852 (11th Cir. 2009) (unpublished), although in Collazo, the First Circuit noted that the existence of this requirement was an open question and concluded that the plaintiff's conduct in that case "effectively and purposefully communicated his opposition," 617 F.3d at 47-48.

20

"virtually always constitutes the employee's *opposition* to the activity." Crawford, 555 U.S. at 281-82 (Alito, J., concurring) (internal quotation marks omitted).

Here, no one could mistake DeMasters' alleged activities for "silent opposition." On the contrary, he asserts that he actively and deliberately communicated to Carilion both Doe's complaints and DeMasters' own opinion that these complaints were not properly handled, offered to share ideas about how they could be better handled, and, like the plaintiff in Collazo, made "persistent efforts to help [Doe] initiate [his discrimination] complaint and urge Human Resources to act upon that complaint."[6] Collazo, 617 F.3d at 47. Thus, even assuming a threshold requirement that conduct be "purposive" to be protected under the Opposition Clause, DeMasters' allegations easily clear that hurdle.

---

[6] Carilion attempts to distinguish Collazo by asserting that the plaintiff in that case expressed actual oppositional views by describing his co-worker's complaint as "a serious case," id. at 44, whereas DeMasters never expressed oppositional views for the purpose of addressing discrimination. But Carilion mischaracterizes DeMasters' actions: By helping to initiate an internal complaint, describing the underlying harassment that Doe faced by relaying that complaint, urging HR to take action, and then criticizing Carilion's handling of the investigation for the hostility it generated among co-workers, DeMasters opposed Doe's harassment at least as effectively as if he had described it as "a serious case." Id.

Having concluded that DeMasters' alleged course of conduct, viewed as a whole, "communicate[d] to [his] employer a belief that the employer has engaged in . . . a form of employment discrimination," Crawford, 555 U.S. at 276, we now address the second part of our test—the subject matter to which this conduct was directed. Here, too, the complaint is sufficient. DeMasters plausibly alleged that he directed his communications to practices that were "actually unlawful" or that, at a minimum, he "reasonably believe[d] to be unlawful," Boyer-Liberto, 786 F.3d at 282 (quoting Navy Fed., 424 F.3d at 406), i.e., the sexual harassment to which Doe originally was subjected, see Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64-65 (1986), and the emerging retaliatory hostile work environment to which Doe was later subjected as a result of Carilion's alleged mishandling of the matter, see Boyer-Liberto, 786 F.3d at 282 (protected conduct includes "oppos[ing] a hostile work environment that, although not fully formed, is in progress"); Noviello v. City of Boston, 398 F.3d 76, 90 (1st Cir. 2005) ("'[D]iscriminate' in the anti-retaliation clause includes subjecting a person to a hostile work environment.").

To the extent the District Court focused on DeMasters' criticism of Carilion's investigation or handling of Doe's complaints, as opposed to the hostile environment resulting from those activities, it again framed the issue too narrowly. The

22

District Court relied heavily on Brush v. Sears Holdings Corp., 466 F. App'x 781 (11th Cir. 2012), which stated that the plaintiff's "disagreement with the way in which [her employer] conducted its internal investigation" into a third-party's allegations of sexual harassment and rape "does not constitute protected activity." Id. at 786. We do not find Brush to be persuasive. Whatever weight it may carry as an unpublished opinion from another Circuit, there was no allegation in that case, as there is here, that the plaintiff reasonably believed the way the employer was handling the matter was itself responsible for an unlawful employment practice, in this case, a retaliatory hostile work environment. At the time of its decision, the District Court also did not have the benefit of this Circuit's decision in Boyer-Liberto, which made clear that "an employee is protected from retaliation for opposing an isolated incident of harassment when she reasonably believes that a hostile work environment is in progress, with no requirement for additional evidence that a plan is in motion to create such an environment or that such an environment is likely to occur." 786 F.3d at 284. We conclude that DeMasters' actions as a whole constitute protected activity and that he thus has pleaded the first element of a prima facie case for a Title VII retaliation claim.

We also have no difficulty concluding that DeMasters sufficiently pleaded the third and only remaining contested element—a causal connection between that protected activity and the termination of DeMasters' employment. Two days before firing him, Carilion's management objected to DeMasters' conduct, confronting him at a meeting about why he had not taken the "pro-employer side," asking if he understood the liability the company could face if its supervisor had engaged in harassment, and asserting that he had not protected Carilion's interests and had left it "in a compromised position." J.A. 31-32. In the very letter that purported to justify his termination, Carilion reiterated that DeMasters had acted contrary to his employer's best interests, had "made statements that could reasonably have led John [Doe] to conclude that he should file suit against Carilion," and had "failed to protect Carilion EAP's client company." J.A. 32. Even at oral argument, Carilion seemed to acknowledge that it retaliated against DeMasters for his opposition activity, with counsel conceding that DeMasters was fired because he "rocked the boat." Transcript of Oral Argument at 40-41 (argued Jan. 29, 2015).

Thus, accepting DeMasters' factual allegations as true and drawing all reasonable inferences in his favor, as we must on a motion to dismiss, Ibarra, 120 F.3d at 474, DeMasters has pleaded both protected activity and a causal connection between

24

that activity and the termination of his employment. DeMasters' complaint thus states a claim for retaliation under the Opposition Clause unless, as the District Court held, the "manager rule" strips DeMasters of that protection. To that subject, we now turn.

**B.**

The "manager rule" has been applied in some Circuits in the context of retaliation claims under the Fair Labor Standards Act ("FLSA") to require that an employee "step outside his or her role of representing the company" in order to engage in protected activity. McKenzie v. Renberg's Inc., 94 F.3d 1478, 1486 (10th Cir. 1996); see also Hagan v. Echostar Satellite, L.L.C., 529 F.3d 617, 628 (5th Cir. 2008); Claudio-Gotay v. Becton Dickinson Caribe, Ltd., 375 F.3d 99, 102 (1st Cir. 2004). It purports to address a concern that, if counseling and communicating complaints are part of a manager's regular duties, then "nearly every activity in the normal course of a manager's job would potentially be protected activity," and "[a]n otherwise typical at-will employment relationship could quickly degrade into a litigation minefield." Hagan, 529 F.3d at 628.

A number of district courts, including the District Court here, have imported this categorical exception into the context of Title VII's anti-retaliation provision. See J.A. 93-94; see also Rice v. Spinx Co., No. 10-1622, 2012 WL 684019, at *5

25

(D.S.C. Mar. 2, 2012); <u>Hill v. Belk Stores Servs. Inc.</u>, No. 06-398, 2007 WL 2997556, at *1 (W.D.N.C. Oct. 12, 2007). Thus, by the reasoning of the District Court, even if DeMasters otherwise had engaged in oppositional conduct, he could not qualify for protection under Title VII because, as an EAP consultant, he had a duty to counsel Doe and to relay his complaints to Carilion's HR department.

DeMasters and the EEOC[7] argue that, whatever place it may have in FLSA jurisprudence, the "manager rule" does not apply to Title VII. We agree. Nothing in the language of Title VII indicates that the statutory protection accorded an employee's oppositional conduct turns on the employee's job description or that Congress intended to excise a large category of workers from its anti-retaliation protections. While the anti-retaliation provisions of Title VII and the FLSA both generally "secure their substantive protections by preventing an employer

---

[7] The EEOC, appearing as amicus curiae in this case, opposed the application of the "manager rule" in the Title VII context in its brief and at oral argument. Because the EEOC offers this view in an amicus brief, which does not have the "force of law," its interpretation here is not entitled to <u>Chevron</u> deference, <u>United States v. Mead Corp.</u>, 533 U.S. 218, 226-27 (2001), but it still "is 'entitled to respect' ... to the extent it has the 'power to persuade,'" <u>Gonzales v. Oregon</u>, 546 U.S. 243, 256 (2006) (quoting <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 140 (1944)). We conclude the EEOC's position accords with the language and purpose of the statute and relevant case law, and we find its briefing and argument to be persuasive.

from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees," Darveau v. Detecon, Inc., 515 F.3d 334, 342 (4th Cir. 2008) (quoting Burlington N., 548 U.S. at 63) (internal quotation marks omitted), we also "must take care to respect any differences in language and purpose between Title VII and the FLSA" before adopting a rule from one to the other, Darveau, 515 F.3d at 342.

Here, those differences counsel against importing the "manager rule" into Title VII. The FLSA's anti-retaliation provision prohibits discrimination against an employee "because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3). In contrast, Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Thus, the conduct protected by the FLSA is far more constricted than the broad range of conduct protected by Title VII's anti-retaliation provision.

27

Supreme Court precedent also militates against restricting the scope of Title VII's anti-retaliation provision, which has been held to "provide broad protection from retaliation," Burlington N., 548 U.S. at 67, and to cover a wide range of conduct through which an employee communicates to an employer the employee's "belief that the employer has engaged in . . . a form of employment discrimination," Crawford, 555 U.S. at 276; see also id. (observing that an employee's communication to her employer of a belief the employer has discriminated "virtually always constitutes the employee's *opposition* to the activity") (internal quotation marks omitted). While the Court indicated in Crawford that there may be "eccentric" exceptions to the sweeping protections of the Opposition Clause, such as "an employee's description of a supervisor's racist joke as hilarious," neither in Crawford nor in subsequent cases has the Court endorsed a categorical exception based on an employee's workplace duties. Id.

The "manager rule" is also problematic when viewed in conjunction with two other doctrines that restrict an employer's Title VII liability. First, under the balancing test adopted by this Circuit in Armstrong v. Index Journal Co., 647 F.2d 441 (4th Cir. 1981), an employer may not be liable under Title VII if an employee's conduct at work is sufficiently "insubordinate, disruptive, or nonproductive." Id. at 448. Applying this

28

doctrine in tandem with the "manager rule" thus would create a dilemma for employees who would have to step outside the scope of employment for their activity to be protected under Title VII's anti-retaliation provision, but would risk losing that protection if the deviation from their job responsibilities could be deemed sufficiently insubordinate or disruptive. See Deborah L. Brake, Retaliation in the EEO Office, 50 Tulsa L. Rev. 1, 31 (2014). We see no need to make plaintiffs walk a judicial tightrope when the statutory scheme created by Congress offers a clear path to relief.

Second, the Supreme Court has provided employers with an affirmative defense under certain circumstances when an employee fails to report and to take advantage of an employer's internal investigation processes. Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998). The Faragher/Ellerth defense thus highlights the importance of employers' internal procedures and of their employees in EAP, HR, and legal departments who facilitate the use of these procedures. Applying the "manager rule" in the Title VII context would discourage these very employees from voicing concerns about workplace discrimination and put in motion a downward spiral of Title VII enforcement: If they remain silent, victims of discrimination are less likely to use their employers' internal investigation mechanisms in the

29

first place, triggering the Faragher/Ellerth defense, and allowing discrimination in the workplace to go undeterred and unremedied. As the Supreme Court observed in a similar context in Crawford, "[n]othing in the statute's text or our precedent supports this catch-22." 555 U.S. at 279; see also Boyer-Liberto, 786 F.3d at 283 (recognizing the need to "encourage the early reporting vital to achieving Title VII's goal of avoiding harm").

Carilion's policy arguments do not change our view. While Carilion harkens to Hagan, 529 F.3d at 628, to warn of a "litigation minefield" without the "manager rule," we find it much more troubling that, under Carilion's approach, the categories of employees best able to assist employees with discrimination claims—the personnel that make up EAP, HR, and legal departments—would receive no protection from Title VII if they oppose discrimination targeted at the employees they are duty-bound to protect. See Boyer-Liberto, 786 F.3d at 283 (observing "effective [Title VII] enforcement could . . . only be expected if employees felt free to approach officials with their grievances") (second alteration in original) (quoting Burlington N., 548 U.S. at 66-67).

In rejecting the "manager rule" in the context of Title VII retaliation claims, we join the only other Court of Appeals that

30

has addressed the issue in a precedential opinion.[8]  In Johnson v. University of Cincinnati, 215 F.3d 561, 579 (6th Cir. 2000), the Sixth Circuit held the fact that the plaintiff, who was an affirmative action official at the University of Cincinnati, "may have had a contractual duty" to advocate for women and minorities did not defeat a retaliation claim.  The Johnson court relied on the language of the Opposition Clause and the EEOC Compliance Manual to determine that "the only qualification that is placed upon an employee's invocation of protection from retaliation under Title VII's Opposition Clause is that the manner of his opposition must be reasonable."  Id. at 580.  We agree with the Johnson court that the "manager rule" would "run[] counter to the broad approach used when considering a claim for retaliation under [the opposition] clause, as well the spirit and purpose behind Title VII as a broad remedial

---

[8] The Tenth and Eleventh Circuits have adopted the "manager rule" in the Title VII context in non-precedential unpublished opinions.  See Weeks v. Kansas, 503 F. App'x 640, 642 (10th Cir. 2012); Brush, 466 F. App'x at 787.  Carilion also relies on EEOC v. HBE Corp., 135 F.3d 543, 554 (8th Cir. 1998), but the Eighth Circuit merely acknowledged the employer's argument that the "manager rule" applied in the Title VII context and noted that the rule was inapplicable, in any event, to the employee in that case.  None of these cases grapples with the differences between the text of Title VII and the FLSA or considers the chilling effects of the "manager rule" on the reporting of workplace discrimination.  We therefore do not find their analysis to be persuasive.

31

measure."   <u>Id.</u>   We therefore hold today that the "manager rule" has no place in Title VII enforcement.

**IV.**

Pursuant to the foregoing, we reverse the judgment of the District Court and remand for further proceedings consistent with this opinion.

<u>REVERSED AND REMANDED</u>